**Joel STRATTE–McCLURE, State–Boston Retirement System and Fjarde AP–Fonden Individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**Morgan STANLEY, a Delaware corporation, John J. Mack, Zoe Cruz, David Sidwell, Thomas Colm Kelleher, Thomas V. Daula, and Gary G. Lynch, Defendants.**

No. 09 Civ.2017(DAB).

United States District Court, S.D. New York.

April 4, 2011.

that existed.

Mark I. Labaton, Kreindler & Kreindler, Los Angeles, CA, Andrew L. Zivitz, Barroway Topaz Kessler Meltzer & Check, LLP, Radnor, PA, for Plaintiffs.

Robert Frank Wise, Jr., Charles S. Duggan, Davis Polk & Wardwell L.L.P., New York, NY, for Defendants.

Michael Max Goldberg, Law Office of Michael Goldberg, Alan Ian Ellman, Javier Bleichmar, Jonathan M. Plasse, Joseph Alberto Fonti, Richard T. Joffe, Labaton Sucharow, LLP, Andrei V. Rado, Milberg LLP, Jesse Strauss, Blank Rome LLP, New York, NY, David Kessler, Jonathen R. Cagan, Richard A. Russo, Jr., Sean M. Handler, Sharan Nirmul, Steven D. Resnick, Barroway Topaz Kessler Meltzer & Check, LLP, Lauren Wagner Pederson, Sharan Nirmul, Radnor, PA, Mark I. Labaton, Kreindler & Kreindler, Los Angeles, CA, for Movants.

## MEMORANDUM AND ORDER

DEBORAH A. BATTS, District Judge.

Lead Plaintiff State Boston Retirement System ("SBRS") and Plaintiff Fjarde AP–Fonden ("FA") bring this putative securities fraud class action, on behalf of themselves and other similarly-situated investors, against Morgan Stanley (the "Company") and six of its officers and former officers: John J. Mack ("Mack"), Zoe Cruz ("Cruz"), David Sidwell ("Sidwell"), Thomas Colm Kelleher ("Kelleher"), Thomas V. Daula ("Daula") and Gary G. Lynch ("Lynch"), pursuant to Sections 10(b), 15 U.S.C. Section 78j(b), and 20(a), 15 U.S.C. Section 78t(a), of the Securities Exchange Act of 1934 (the "Exchange Act").

Plaintiffs allege that Defendants undertook a series of risky positions in the subprime mortgage securities market in December 2006, and that they made numerous material misstatements and omissions from June 20, 2007 through December 19, 2007 (the "Class Period") to conceal Morgan Stanley's exposure and losses associated with these positions. Plaintiffs allege that the misstatements and omissions fraudulently inflated the Company's stock price during the Class Period. As a result, when the truth was ultimately disclosed, Morgan Stanley's stock price declined in value and investors suffered substantial economic harm.

Defendants have moved to dismiss the Amended Class Action Complaint (the "Complaint" or "Compl.") pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and Section 78u–4(b) of the Private Securities Litigation Reform Act, arguing that the Complaint lacks adequate allegations of falsity, scienter, and loss causation. Because the Court finds that the Complaint fails to allege the falsity of certain disputed statements with sufficient specificity and the loss causation of other disputed statements adequately, the Motion to Dismiss is GRANTED in its entirety.

## I. BACKGROUND

The following facts alleged in the Amended Class Action Complaint are assumed to be true for purposes of the Motion to Dismiss before the Court.

### A. Parties

Plaintiffs SBRS and FA are institutional investors who purchased shares of Morgan Stanley common stock during the Class Period (Compl. ¶ 46–47), and bring this action on behalf of a class consisting of all those persons and entities who purchased or otherwise acquired Morgan Stanley's common stock during the Class Period and were thereby damaged.

Defendant Morgan Stanley is a diversified financial services corporation headquartered in New York City. (*Id.* ¶ 49.) Throughout the Class Period, Morgan Stanley securities were actively traded on the New York Stock Exchange ("NYSE") under the symbol "MS." (*Id.*)

Defendant Mack was Morgan Stanley's Chief Executive Officer ("CEO") and Chairman of the Board of Directors during the Class Period. Defendant Sidwell was Morgan Stanley's Chief Financial Officer ("CFO") and Executive Vice President from March 2004 through October 11, 2007. Defendant Cruz was Morgan Stanley's Co–President from March 2005 through November 29, 2007. Defendant Daula was the Company's Chief Risk Officer during the Class Period. Defendant Lynch was Morgan Stanley's Chief Legal Officer and General Counsel during the Class Period. Defendant Kelleher became Morgan Stanley's Chief Financial Officer on October 11, 2007, and was a member of Morgan Stanley's Management Committee throughout the Class Period. (*Id.* ¶¶ 52–57.)

### B. Morgan Stanley's Risk Strategy and Subprime Credit Default Swap Positions

In June 2005, Defendant Mack was appointed CEO of Morgan Stanley and began pressing the Company to take more risks to improve its performance relative to its investment banking peers. (Compl. ¶ 4, 74.) To establish some limits on this enhanced-risk approach, the Company developed a comprehensive risk control program, providing for daily comprehensive risk reports, independent reviews of marks-to-market, and risk limits at various levels throughout the firm. (*Id.* ¶¶ 98–100.)

As part of its new approach, Defendants increased trading of Morgan Stanley's assets for the Company's own account, and created a sub-unit within its Institutional Securities division named the Proprietary Trading Group to further this goal. (*Id.* ¶¶ 91–93.) In December 2006, the Proprietary Trading Group "secretly" made a large bet on future movements of the subprime market. (Compl. ¶¶ 70, 110.) The bet involved taking a short position on weak assets in the subprime market, and then hedging this bet with a long position on relatively-secure assets. Specifically, Morgan Stanley took a short position by buying credit default swaps (or "swaps") on low-rated groups of collateralized debt obligations ("CDOs") based on residential mortgage-backed securities.[1] (*Id.* ¶¶ 122, 126.) According to the terms of the

---

1. Subprime mortgages, residential mortgage-backed securities (or "RMBSs"), collateralized debt obligations (or CDOs) and credit default swaps have been described at length in opinions by this court, *see, e.g., In re Security Capital Assur. Ltd. Securities Litigation,* 729 F.Supp.2d 569, 575 (S.D.N.Y.2010), and other courts, *See In re Citigroup Inc. Securities Litigation,* 753 F.Supp.2d 206, 213–16 (S.D.N.Y. 2010); *Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.,* 753 F.Supp.2d 166, 171–72 (S.D.N.Y.2010), and need not be re-defined here.

swaps, Morgan Stanley would receive payments when certain low-rated CDOs defaulted, and the Company's position would therefore increase in value as the low-rated CDOs declined in value.

Morgan Stanley then hedged this short position by selling credit default swaps on approximately $13.2 billion of higher-rated "super senior" CDOs. Under the terms of these long-position swaps, defaults in the super senior CDO groups would require Morgan Stanley to make payments to investors who purchased the swaps. However, since the top-rated CDO groups were "seen as being very safe," Morgan Stanley considered them unlikely to default or trigger any payment obligations and therefore saw the long positions as a secure hedge for its short position. (*Id.* ¶¶ 123–26.) The Company used the periodic payments it received from selling its long-position swaps on super senior CDOs to fund its purchase of the short-position swaps on low-rated CDOs. (*Id.*)

In spite of this sophisticated hedging strategy, the value of Morgan Stanley's swap positions declined substantially in 2007. As the mortgage market deteriorated, investment banks like Morgan Stanley were left "holding billions of dollars in illiquid subprime mortgages and [mortgage-backed securities] on their books",

and the value of the securities and swaps based on the securities declined. (Compl. ¶ 155.)

The Complaint alleges that the value of Morgan Stanley's $13.2 billion swap position was "inherently linked" to an index of subprime residential mortgage-backed securities known as the ABX BBB 06–1 Index ("ABX Index"). (Compl. ¶ 183.) Although the ABX Index did not measure the direct value of Morgan Stanley's swaps, it tracked the cost of buying and selling swaps on residential mortgage-backed securities, and thus allegedly reflected the value of the Company's swaps.[2] (*Id.* ¶¶ 131–40) Therefore, when the index declined 32.8 percent between May 31, 2007 and August 31, 2007, during Morgan Stanley's third quarter, Plaintiffs argue that the value of Morgan Stanley's swap position declined 32.8 percent as well. (Compl. ¶ 25, 184.) Accordingly, the Complaint alleges that the Company was required to write down its position by $4.4 billion during its third quarter.[3] (*Id.*)

However, Defendants only recognized a $1.9 billion mark-down on its position, avoiding recognition of the full $4.4 billion loss by valuing their position based on subjective factors that did not correlate to the ABX Index. (*Id.* ¶ 27, 185.) Plaintiffs allege that Defendant Daula expressed

**2.** To demonstrate the link between the ABX Index and Morgan Stanley's swaps, Plaintiffs note Defendant Kelleher's statement on November 7, 2007 that the decline in the fair value of the Company's position was "due to the sharp decrease in the BBB ABX price indices", and the 8–K filed by Morgan Stanley on November 7 cited the ABX indices as a reference point for measuring the Company's subprime exposure. (Compl. ¶¶ 144, 339.) Similarly, the chart attached to Morgan Stanley's November 7, 2007 press release stated that the Company took into consideration "the continued deterioration in market data, as reflected by the sharp decline in the ABX indices" when valuing its subprime mortgage-related positions. (*Id.* ¶ 144.) Finally, Plain-

tiffs note that Defendant Kelleher wrote a letter to the SEC on February 1, 2008, stating that "One of the key proxies for the move in the fair value of the Company's super senior credit default swaps is the ABX BBB index." (Compl. ¶ 279)

**3.** All references to the "second quarter", "third quarter" and "fourth quarter" of 2007 in this opinion refer to Morgan Stanley's fiscal quarters. The Company's second fiscal quarter began March 1, 2007 and ended May 31, 2007 (Compl. ¶ 231), its third fiscal quarter began June 1, 2007 and ended August 31, 2007 (Compl. ¶ 25), and its fourth fiscal quarter began September 1, 2007 and ended November 30, 2007 (Compl. ¶ 143).

concern about the models used to value subprime securities, citing a Financial Times article dated December 21, 2007 which reported that Daula "was very vocal in saying that there were no proper pricing models for [the Proprietary Trading Group] trades, that positions were not being properly measured, and that the history traders used in their models was not a reliable guide." (*Id.* ¶ 226.) (brackets added.) However, as a result of the $1.9 billion mark-down, Defendants were able to keep their third quarter financial results consistent with analysts' expectations and avoid adverse market reaction to the Company's true financial state.[4] (*Id.* ¶¶ 185, 192–95.)

On November 2, 2007, Morgan Stanley dismissed Howard Hubler, the managing director of the Proprietary Trading Group who had negotiated the swap positions. (Compl. ¶ 33.) Within days, rumors began to circulate that Morgan Stanley would need to take large mark-downs on its balance sheet because of a "massive subprime trade" that had "gone awry". (*Id.* ¶¶ 34, 201.) On November 7, the Wall Street Journal reported that two research analysts predicted Morgan Stanley would take a $3–6 billion mark-down on mortgage-related assets. (*Id.* ¶ 442.) In response to these rumors, Morgan Stanley's stock dropped 8 percent, from $55.59 on November 5 to $51.19 on November 7. (*Id.* ¶ 287.)

On November 7, after the close of the U.S. markets, Morgan Stanley issued a press release stating that the value of its subprime-related investments had declined by $3.7 billion since the end of the third quarter, and that it still retained exposure to $6.0 billion in subprime-related investments. (Compl. ¶¶ 35, 284.) The Company also revealed that it had marked down its subprime securities by $1.9 billion in the third quarter. (Compl. ¶ 355.) The disclosures were repeated in an 8–K issued on the same day. (*Id.* ¶ 357.) In the 8–K, Morgan Stanley included a disclaimer that its exposures "will frequently change and could further deteriorate." (*Id.*) However, the Complaint alleges that the disclosures were incomplete and continued to hide the Company's massive subprime exposures and losses. (*Id.* ¶ 295.) Following the Company's November 7 disclosures, Morgan Stanley's stock price rose by 4.9 percent on November 8 to $53.68. (*See* Daily Closing Price of Morgan Stanley Stock, Exhibit ("Ex.") E to Wise Aff. Supp. Defs. Mot. Dismiss ("Wise Aff.").)

By the close of Morgan Stanley's fourth quarter, on November 30, 2007, Defendants could "no longer conceal the truth" and were forced to mark down the Company's swap position further. (Compl. ¶ 303.) In announcing its fourth quarter earnings, on December 19, 2007, Defendants disclosed an additional $5.7 billion mark-down of their mortgage-related securities, bringing the cumulative mark-down total in the fourth quarter of 2007 to $9.4 billion. (Compl. ¶ 296.) Of the $9.4 billion, $7.8 billion was allegedly related to the swap position undertaken by the Proprietary Trading Desk. (*Id.*)

## C. Alleged Fraudulent Misrepresentations and Omissions

The Complaint identifies three categories of misstatements and omissions made by Defendants: (a) misrepresentations regarding the risk controls Morgan Stanley had instituted to monitor its positions, (b) misrepresentations and omissions regarding Morgan Stanley's exposure to subprime-related assets, and (c) misrepresentations regarding Morgan Stanley's subprime-related losses.

4. Specifically, Plaintiffs allege that the "low end" of analysts' predictions for earnings per share were $1.38. By marking down its subprime losses by only $1.9 billion, the Company was able to report earnings per share of $1.38. (Compl. ¶ 350.)

### (1) Risk Controls

The Complaint alleges that Defendants repeatedly misrepresented the structure and practices of its risk management system. In early March 2007, Defendant Sidwell stated that Morgan Stanley managed its risk through "a variety of hedging strategies [and] proprietary risk positions." (Compl. ¶ 228.) During the Company's annual meeting in April 2007, Mack attributed Morgan Stanley's performance to the Institutional Securities Group division's ability to "manage a tremendous amount of risk in a smart and disciplined way." (Id. ¶ 7.) In response to an inquiry from a shareholder at the meeting, Mack stated that Morgan Stanley had the capacity to take a lot more risk than it had in the past and that Defendants Daula and Cruz formed a "very strong combination" that managed the Company's risk. (Id.) In quarterly reports filed with the Securities and Exchange Commission ("SEC") on July 10, 2007 and October 10, 2007, the Company asserted that its risk managers and valuation experts operated "independently" of the managers and traders who took on risk and that "groups independent from the trading divisions within the Financial Control and Market Risk Departments participate in the review and validation of the fair values generated from pricing models." (Id. ¶ 103.)

In contrast to these representations, the Complaint alleges that Morgan Stanley did not maintain an effective risk control system. (Compl. ¶ 249.) The Company was generally "negligent in implementing internal controls as appropriate and necessary to manage the increased level of risk" and took on unsound positions which ultimately led to the large subprime markdowns. (Id.) Further, the Complaint alleges that the Company misrepresented the independence of its risk managers, noting that Defendant Daula, the chief risk officer, reported to Defendant Cruz, who oversaw the Institutional Securities Group and whose bonus was linked to profits in proprietary trading. (Id. ¶¶ 210–12.) According to the Plaintiffs, this reporting hierarchy was inconsistent with Defendants' statements about the Company's risk reporting structure, since the individual responsible for managing risk was reporting directly to an individual who was compensated for taking on risk. (Id. ¶ 211.) In short, the Complaint alleges that the risk control system "placed the fox in charge of the proverbial henhouse." (Id.)

### (2) Exposure to Material Risks

The Complaint alleges that Defendants misstated the Company's subprime exposure and failed to disclose the risks the Company had taken. (Id. ¶¶ 7, 166, 240(f).) While reporting earnings for the first quarter of 2007 on March 21, Defendant Sidwell stated that "credit products rose 110 percent to a new record, with the largest increase in securitized products driven by favorable positioning in the subprime mortgage market." (Id. ¶ 162.) Sidwell also stated that Morgan Stanley undertook proprietary risk positions in the subprime mortgage market, but when analysts and investors "questioned whether the Company was truly well-positioned and requested further details regarding its subprime mortgage exposure, Defendants refused to provide the market with additional transparency, stating . . . that they 'don't really want to address specifically how [Morgan Stanley is] positioned [in the mortgage market].' " (Compl. ¶ 163; Transcript of Q1 2007 Morgan Stanley Earnings Conference Call, Ex. B to Wise Aff. at 4). On June 20, 2007, Sidwell assured the analysts and investors on the call that Morgan Stanley "certainly did not lose money in [the subprime mortgage] business" during the second quarter of 2007. (Compl. ¶ 165.)

According to the Plaintiffs, these statements communicated that Morgan Stanley's subprime exposure was controlled and the Company was well-positioned to escape from the deterioration in the subprime market relatively unscathed. (*Id.* ¶ 228; Pls.' Opp. Mem. at 19–21) However, Defendants' statements obfuscated an alleged deepening concern within Morgan Stanley about its exposure. On July 4, 2007, the Complaint alleges that Defendant Cruz became alarmed at the extent of the subprime exposure and ordered Defendant Daula to limit the Company's swap positions—but did not disclose any information about the troubling positions in its subsequently-filed second quarter earnings statement. (*Id.* ¶¶ 174, 177–79, 405–06.) Citing an undisclosed confidential informant, the Complaint alleges that Morgan Stanley assembled a "super task force" to develop creative strategies to sell off its risky subprime holdings. (*Id.* ¶ 223.) By July 2007, the Company's "massive exposure" to subprime assets was known to "all of Morgan Stanley's senior executives" and was "knowingly concealed from investors." (*Id.* ¶ 222.)

Seeking additional information about the Company's subprime exposure, the SEC wrote to the Company on August 30, 2007 and stated that "it is possible that more clarity about your exposure to any subprime loans could be helpful." *See* Letter of Colm Kelleher to John Hartz, Ex. 20 to Wohl Decl. Opp. Defs. Mot. Dismiss ("Wohl Decl.") at 2. In the same inquiry, the SEC requested detailed information about the Company's asset valuation methodology. (*Id.* at 14–15.) Still, when the Company reported its earnings results several weeks later, Plaintiffs allege that the Company did not disclose sufficient details on its subprime exposure.[5] (Compl. ¶ 222.)

Finally, Plaintiffs cite a group of generalized GAAP provisions requiring companies to provide useful information and to prioritize substance over form, among other things, and allege that Defendants violated these provisions by not providing enough information in their disclosures. (*Id.* ¶¶ 315–16)

### (3) Quarterly Earnings Reports

Plaintiffs allege that Defendants made repeated misstatements and omissions in its earnings results of 2007 by failing to recognize subprime-related losses. (Compl. ¶ 73.) More specifically, Plaintiffs argue that Financial Accounting Standards Board, Statement of Position 157 ("FAS 157") required Morgan Stanley to value assets and liabilities according to "Level 2" inputs, which involve objective valuations such as quoted prices for similar assets. (*Id.* ¶¶ 185–87.) Plaintiffs allege that the ABX Index was a relevant Level 2 input and that Morgan Stanley was therefore required to value its swaps according to shifts in the index.[6] (*Id.* ¶¶ 183–85.) Thus

---

**5.** As Defendants point out, the Company did make some statements disclosing its subprime exposure. In announcing Morgan Stanley's third quarter results on September 19, 2007, Defendant Sidwell alerted investors about Morgan Stanley's subprime exposure very early in the earnings call, stating that "increased volatility, significant spread widening, lower levels of liquidity, and reduced price transparency at all parts of the capital structure" influenced "the effectiveness of hedging strategies, subprime mortgage markets including the CDO market, as well as other structured credit products." (*See* Transcript of Q3 2007 Morgan Stanley Earnings Conference Call, Ex. C to Wise Aff. at 2.) Defendant Kelleher also explained that, "being a major market player, we remain exposed to risk exposures through a number of instruments, lending commitments, subprime, CDOs, commercial mortgages mortgages [sic] are examples." (*Id.* at 7.)

**6.** In support of their position, Plaintiffs note that FAS 157 states that "techniques used to measure fair value shall maximize the use of

when the ABX Index declined 32.8 percent in the third quarter of 2007, the Company was required to mark its swaps down by 32.8 percent and disclose this loss in its quarterly statement. (*Id.*)

However, instead of taking a 32.8 percent mark-down, Morgan Stanley valued its swaps based on subjective "Level 3" criteria, which relied on internal company models and managerial judgment. (Compl. ¶¶ 185–86.) Plaintiffs allege that this use of Level 3 criteria, which are not transparent to the investing public, was improper under FAS 157 and misrepresented the true value of the swaps.[7] (*Id.*) Moreover, Plaintiffs allege that even if accounting protocols allowed a valuation based on Level 3 criteria, the steep declines in the ABX Index required Morgan Stanley to mark down its assets more aggressively than it did. (*Id.* ¶¶ 25, 147, 266(h), 295(e), 347.)

(4) November 7, 2007 Disclosures

Plaintiffs allege that the disclosures made by Morgan Stanley on November 7, 2007 were incomplete and continued to mask the Company's massive subprime losses. (*Id.* ¶¶ 291; 295(e).) Thus on a November 7 conference call discussing the Company's losses, Defendant Kelleher stated that "as a result of the rigorous processes we have in place, the [marks] we took back in August appropriately reflected fair value at that time. However, Plaintiffs allege that Morgan Stanley continued to value their swaps according to inaccurate Level 3 criteria (and not the ABX Index), and therefore its disclosures did not reflect the fair value of its swaps. (*Id.* ¶ 295) The [marks] we are announcing today appropriately reflect the values as of

October 31 ..." *See* Transcript of November 7, 2007 Conference Call, Ex. 21 to Wohl Decl., at 3. Plaintiffs also allege that Morgan Stanley failed to disclose the material risks associated with its subprime-related exposure in the fourth quarter of 2007, and failed to disclose that further losses were likely in the future. (*Id.*)

## II. DISCUSSION

### A. Legal Standard for a Motion to Dismiss under Rule 12(b)(6)

For a complaint to survive dismissal under Rule 12(b)(6), the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility," the Supreme Court has explained,

> "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.' "

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Twombly*, 550 U.S. at 556–57, 127 S.Ct. 1955). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twom-*

---

observable inputs and minimize the use of unobservable inputs." (SFAS 157 ¶ 21.)

**7.** The Complaint, however, does acknowledge that Morgan Stanley's third quarter 10–Q in-

cluded "certain credit default swaps" in its listing of financial instruments that were valued using Level 3 inputs. (*Id.* ¶ 191)

*bly,* 550 U.S. at 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (internal quotation marks omitted). "in keeping with these principles," the Supreme Court has stated,

"a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."

*Iqbal,* 129 S.Ct. at 1950.

■ In ruling on a 12(b)(6) motion, a court may consider the complaint as well as "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Communc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (citation omitted). The court may also consider "well publicized stock prices." *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 167 n. 8 (2d Cir.2000).

### B. Section 10(b) Claim (Count One)

■ Section 10(b) of the Securities Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may proscribe." 15 U.S.C. § 78j(b). Rule 10b–5 implementing § 10(b) prohibits "mak[ing] any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not mislead-

ing ..." 17 C.F.R. Section 240.10b–5. To state a claim for securities fraud under Section 10(b) and Rule 10b–5, a plaintiff must allege that each defendant "(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *ATSI Communc'ns,* 493 F.3d at 105 (citing *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 172 (2d Cir. 2005)).

Securities fraud claims are governed by the heightened pleading standard of Fed. R.Civ.P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b). Rule 9(b) requires a plaintiff pleading fraud to state with particularity "the circumstances constituting [the] fraud," and adequately specify "(1) the statements that [it] contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *See* Fed.R.Civ.P. 9(b); *Rombach v. Chang,* 355 F.3d 164, 170 (2d Cir.2004).

■ The Second Circuit has explained that plaintiffs "must do more than say that the statements ... were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach,* 355 F.3d at 174 (2d Cir.2004). Similarly, under the PSLRA, the complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading ..." 15 U.S.C. § 78u–4(b). A securities fraud claim must also allege that the misstatement was "false when made" and may not be based on optimistic statements or puffery. *See Rombach,* 355 F.3d at 174; *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Co., Inc.,* 75 F.3d 801, 811 (2d Cir.1996) ("general

announcements by [Defendant] that it was 'optimistic' about its earnings and 'expected' ... to perform well" are "puffery [that] cannot have misled a reasonable investor ... and cannot constitute actionable statements under the securities laws.").

■ To allege adequately securities fraud based on omissions, a plaintiff must allege that "the corporation is subject to a duty to disclose the omitted facts." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir.1993). A corporation is "not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *Id.* at 267. Nevertheless, a "duty to disclose 'arises when disclosure is necessary to make prior statements not misleading.'" *Id.* at 268.

■ Under either misstatement or omissions claims, a Complaint must establish a strong inference of scienter by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir.2007). In order to allege adequately recklessness, a plaintiff must have "specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir.2000). In addition, a complaint must create an inference of scienter that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323–24, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007).

Here, to state an actionable claim under Section 10(b), Plaintiffs are required to plead that Morgan Stanley's disclosures surrounding its risk controls, subprime exposure and earnings statements were false when made, and they must explain "with specificity why and how that is so." For the reasons that follow, the Court finds that Plaintiffs have failed to allege adequately "why and how" the first two categories of alleged misstatements were false, and thus do not satisfy the first element of a Section 10(b) claim. Accordingly, the Court does not address whether the Complaint adequately alleges the other elements of the claim for these two categories of misstatements. However, the Court finds that the Complaint presents adequate allegations of falsity for valuation-related disclosures made by Morgan Stanley in the third and fourth quarters of 2007, and therefore considers scienter and loss causation with respect to these disclosures below.

(1) Misstatements and Omissions

Plaintiffs use the group pleading standard to establish that Defendants were responsible for making Morgan Stanley's earnings statements. (Compl. ¶¶ 52–64.) Under the standard, Plaintiffs are allowed to rely on the presumption that collectively-authored documents such as SEC filings are the work of individuals with involvement in the everyday business of the company. *See In re Citigroup Inc. Securities Litigation*, 753 F.Supp.2d at 238–39. Since Plaintiffs have alleged that all Defendants were either involved in the preparation of Morgan Stanley's SEC filings or were directly involved in the day-to-day operations of the company, Plaintiffs' allegations are sufficient to establish that Defendants made the statements in dispute.[8] *Id.* Next, the Plaintiffs must prove the falsity of the statements at issue.

---

8. Obviously, however, statements made after Sidwell or Cruz left the Company can not be attributed to them.

### a. Alleged Misstatements Concerning Risk Controls

■ Plaintiffs first allege that Defendants misrepresented the risk controls Morgan Stanley had instituted to monitor its subprime swap positions, citing generalized statements about the effectiveness of the Company's risk management. However, the cited statements did not amount to a guaranty that Morgan Stanley's risk management was flawless or that it would prevent any business missteps. Instead, they are properly classified as "puffery" and therefore are not actionable as a matter of law. *See ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.,* 553 F.3d 187, 196 (2d Cir.2009) (finding assertion that Defendant had " 'risk management processes [that] are highly disciplined and designed to preserve the integrity of the risk management process' " non-actionable puffery); *Plumbers' Union Local No. 12,* 753 F.Supp.2d at 172–73 (finding assertion that Defendant took a "cautious stance" regarding various risks, that it could "manage volatility," and that it engaged in "active management of financial market risk" non-actionable puffery).

Plaintiffs also challenge Morgan Stanley's representation that its risk managers operated "independently" of the business managers who were assuming risk, alleging that Defendant Daula, who was the Chief Risk Officer, reported directly to Defendant Cruz, who oversaw the Institutional Securities Group. However, Cruz was not a mere business manager—she was the Co–President of Morgan Stanley and maintained a variety of other senior-level positions within the Company. (Compl. ¶ 55.) Plaintiffs do not specifically allege that Cruz influenced the Company's risk assessments or that she inhibited the independent operation of the risk management group in any manner. As such, Plaintiffs' allegations fail to identify any risk protocol that Defendants failed to follow, and therefore fail to allege any actionable misstatement. *See In re Australia and New Zealand Banking Group Ltd. Securities Litigation,* 08 Civ. 11278(DLC), 2009 WL 4823923, at *11 n. 13 (S.D.N.Y. Dec. 14, 2009) (finding defendant's statements about risk control systems non-actionable where plaintiff failed to allege specifically why statements were not accurate).

### b. Alleged Misstatements and Omissions Concerning Exposure to Subprime Securities

■ The next category of allegations relates to Defendants' statements regarding Morgan Stanley's exposure to subprime-related securities. According to the Complaint, Defendants represented that Morgan Stanley was well-positioned in the subprime mortgage market during the first quarter of 2007 and that it did not lose money in the subprime mortgage market in the second quarter of 2007. However, Plaintiffs do not specifically allege any reasons why these statements were false.

Plaintiffs suggest that the cited statements communicated that Morgan Stanley was well-positioned for future changes in the subprime market, but reports of current results do not constitute assurances about future results. *In re Citigroup, Inc. Sec. Litig.,* 330 F.Supp.2d 367, 378 (S.D.N.Y.2004) (rejecting argument that "reporting of revenue figures implicitly represented that such results would continue"), *aff'd sub nom. Albert Fadem Trust v. Citigroup Inc.,* 165 Fed.Appx. 928 (2d Cir.2006); *In re Duane Reade Inc. Sec. Litig.,* 02 Civ. 6478(NRB), 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003) ("[D]isclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future."), *aff'd sub nom. Nadoff*

*v. Duane Reade, Inc.*, 107 Fed.Appx. 250 (2d Cir.2004). Even assuming that Defendants' representations about the Company's positioning were open-ended and related to future business results, such statements would constitute non-actionable puffery. *Rombach*, 355 F.3d at 174 (a company is "not required to take a gloomy, fearful or defeatist view of the future"); *In re Sierra Wireless, Inc. Securities Litigation*, 482 F.Supp.2d 365, 377 (S.D.N.Y.2007) (holding expressions of corporate optimism did not give rise to securities violations and finding statement that company was "well-positioned" non-actionable); *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat., PLC*, 423 F.Supp.2d 348, 358 (S.D.N.Y.2006) (finding press release stating that defendant was "well-positioned to weather the current economic uncertainty" non-actionable when accompanied by cautionary language.)

 Likewise, the allegations concerning Defendants' non-compliance with GAAP fail to state a claim because Plaintiffs rely on broad provisions that "tolerate a range of 'reasonable' treatments [in financial reporting], leaving the choice among alternatives to management." *Thor Power Tool Co. v. Comm'r of Internal Revenue*, 439 U.S. 522, 544, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979) (addressing GAAP principles). Specifically, the Complaint cites GAAP provisions which call for financial reporting that is "useful", prioritizes substance over form, and comports with principles of "reliability", "completeness" and "conservatism," among other things. Such broad provisions cannot form the basis for a Section 10(b) violation under these facts. *See Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 120 (2d Cir. 1982) ("allegations concerning the violation of generalized accounting principles requiring adequacy and fairness of disclosure, a conservative approach, complete financial information, and understandable methods of reporting" do not satisfy Rule 9(b)).

Plaintiffs also suggest that Morgan Stanley made material omissions by failing to disclose details of its subprime exposure, but the Company had no obligation to make such disclosures. Defendants disclosed that it undertook proprietary trading positions in the subprime market, and this was sufficient to disclose the Company's exposure. *See Plumbers' Union*, 753 F.Supp.2d at 181 ("There is no obligation for an issuer to identify specifically every type of asset or liability it possesses, so long as its disclosures are 'broad enough to cover' all instruments that are in fact relevant to the value of the issuer's securities.") (citing *Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 730 (2d Cir.1998)); *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F.Supp.2d 348, 358 (S.D.N.Y.2006) ("Knowledge of potential concerns about certain holdings in the portfolio, without more, does not preclude optimistic statements about overall future performance.").

However, while Defendants did not have an obligation to disclose the Company's subprime *exposure*, they did have an obligation to disclose the Company's subprime *losses*. As discussed below, Plaintiffs have alleged sufficient facts to support the inference that Defendants failed to disclose $2.5 billion in subprime losses in the third and fourth quarters of 2007. This failure constitutes a claim for securities fraud under either misstatement or omission theories. Here, Plaintiffs rely on a misstatement theory, arguing that Plaintiffs' third and fourth quarter disclosures misstated the Company's financial results. Accordingly, we consider Plaintiffs' allegations below.

c. Alleged Misstatement in Third Quarter 2007 Earnings Statement and November 7, 2007 Press Release

■ Plaintiffs' final category of allegations relates to Defendants' failure to mark down its subprime swap position adequately and to report losses in its quarterly earnings statement and other disclosures. Plaintiffs allege that Defendants should have recorded a $4.4 billion mark-down in the third quarter of 2007 (or 32.8 percent of the total position value) in accordance with the decline in the ABX Index, but only recorded a $1.9 billion mark-down (or 14.4 percent of the total position value). Plaintiffs argue that Defendants' failure to take the 32.8 percent mark-down and its use of Level 3 inputs to value its position led to an actionable misstatement in its third quarter results. Furthermore, noting that the Company subsequently wrote down its position by 44.6 percent on November 7, 2007, while the ABX Index declined only 23.3 percent during the same period, Plaintiffs argue that "the only credible explanation" for Defendants' failure to mark down their assets earlier is that Defendants engaged in fraud.

Defendants respond that the swaps at issue involved super senior CDOs which were more secure than the mid-level securities measured by the ABX Index, and so the value of the swaps did not decline as rapidly as the ABX Index in the third quarter of 2007 and did not warrant a 32.8 percent mark-down during that time. However, once the weaker assets measured by the ABX Index deteriorated, the market slowdown spread to more secure assets, including super senior CDOs. As a result, the value of Morgan Stanley's swaps fell precipitously in the fourth quarter of 2007 and required sharp mark-downs. (Def. Reply Mem. at 2–3.) Given this "obvious alternative explanation" for the timing of Morgan Stanley's mark-downs, Defendants argue that Plaintiffs fail to allege sufficiently that the Company's contemporaneous mark-downs were false.

The valuation of assets and the timing of mark-downs have been addressed at length by courts in this District. Since valuations ordinarily involve questions of business judgment, courts generally decline to find securities fraud stemming from statements about valuations. *See City of Omaha v. CBS Corp.*, 08 Civ. 10816(PKC), 2010 WL 1029290 (S.D.N.Y. Mar. 16, 2010) (timing of goodwill mark-downs was question of management judgment and discretion, despite evidence of deteriorating goodwill value); *In re Security Capital Assur. Ltd.*, 729 F.Supp.2d at 597–98 (claim that defendants understated mark-to-market losses on CDO swaps was criticism of business judgment, despite evidence of deteriorating market conditions).

However, where parties maintain high valuations on assets in the face of red flags that the valuations are inaccurate, courts have sustained securities fraud claims. *See Novak v. Kasaks*, 216 F.3d 300 (2d Cir.2000) (valuation of inventory was actionable misstatement where 35 percent of inventory was several years old and unlikely to be sold at full price, if at all); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC.*, 376 F.Supp.2d 385, 396 (S.D.N.Y.2005) (sudden change in defendants' valuation of portfolio, such that it was 31 percent higher than prime broker's valuation of the portfolio, supported inference that higher valuation was inaccurate); *In re Flag Telecom Holdings, Ltd. Securities Litigation*, 352 F.Supp.2d 429, 465–66 (S.D.N.Y.2005) (consistent valuation of trans-Atlantic cable system actionable where key market had "imploded", prices declined by 70 percent annually, and confidential sources indicated the company missed sales targets by 80–90 percent).

Here, Plaintiffs' allegations concerning Defendants' valuation of their subprime

position adequately states a claim for securities fraud. Plaintiffs describe a strong link between Morgan Stanley's swap position and the ABX Index (which is supported by the Company's own public statements), and allege that movements in the ABX Index should have been reflected in Morgan Stanley's contemporaneous swap valuations. As a result, when the ABX Index declined by 32.8 percent in the third quarter of 2007, and Defendants only marked down their swap position by 14.4 percent, the pleadings create a plausible inference that the mark-down understated the Company's true loss by $2.5 billion, and that the disclosures reflecting this valuation were therefore inaccurate.

This case is directly on point with a recent decision involving subprime securities, *In re Citigroup Inc. Securities Litigation*, 753 F.Supp.2d 206 at 223–24. In *Citigroup*, the plaintiff alleged that the defendant financial institution should "have taken write-downs on its CDO holdings in reaction to precipitous drops in the TABX, a widely used index [related to the ABX Index] that tracked the price of mezzanine CDOs." *Id.* (brackets added) The court found that the plaintiffs' allegations stated a plausible claim and declined to dismiss the case at the motion to dismiss phase, rejecting the defendant's arguments that the "ABX and TABX indices are not appropriate barometers of the value of Citigroup's CDOs." *Id.* at 236.

Likewise, Defendants here argue that the ABX Index does not reflect the value of Morgan Stanley's swaps, and present a credible explanation for the reason that their mark-downs diverged from the sharp drop in the ABX Index. However, as in *Citigroup*, Defendant's explanation presents a factual dispute that this Court cannot resolve on a motion to dismiss.

Finally, Plaintiffs allege adequately that Defendants committed actionable omissions and misstatements by failing to disclose their losses throughout the fourth quarter. From September 19, 2007 to December 19, 2007, the Company's subprime positions deteriorated and Defendants' ability to liquidate those positions worsened, yet the Company did not disclose its full losses until December 19, 2007. (Compl. ¶¶ 295–302.) Instead, during the November 7 conference call, Defendant Kelleher stated that the mark-downs on the positions reflected in the September 2007 earnings disclosures were accurate, and that the marks reflected in its November 7 release were accurate.[9]

d. Scienter

 Plaintiffs allegations create a strong inference of scienter against the Company. The SEC raised detailed questions about the Defendants' subprime holdings and valuations in their August 30, 2007 letter to Defendant Sidwell, creating the inference that the Company was aware of regulatory concerns about the valuation of subprime securities. Moreover, around the same time, Plaintiffs allege that Defendant Daula "was very vocal" in raising internal concerns about the Company's subprime valuation models. These two warning signs, both occurring in August 2007, at the same time that the ABX Index was rapidly declining, should have alerted Defendants to the need to ensure that its subprime valuations were accurate. *See In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 08 MDL

---

9. Plaintiffs also raise allegations concerning Defendants' valuation statements in Morgan Stanley's earnings statement for the second quarter of 2007, but do not plead specific details explaining "how and why" these statements or false, and do not press any arguments regarding the statements in opposition papers. Accordingly, the court finds that they do not constitute actionable misstatements.

1963(RWS), 763 F.Supp.2d 423, 450–51, 2011 WL 223540 at *9 (S.D.N.Y. Jan. 19, 2011) (finding scienter where defendants disregarded warnings from the SEC regarding Bear Stearns' risk and valuation models).

Nevertheless, Plaintiffs allege that Defendants recklessly ignored these warning signs, and significantly overvalued its swap position a few weeks later when it issued its earnings statement for the third quarter of 2007. As a result, the Company was able to meet analysts expectations for the third quarter.[10] However, nearly two months later, the Company drastically cut its subprime valuation in a manner that doubled the rate of decline of the ABX Index. The smaller mark-down reflected in the third quarter earnings statement coupled with the larger mark-down post-dating the earnings statement further support an inference that Defendants consciously or recklessly overstated the valuation reflected in the statement. *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (large restatement supported inference of scienter where plaintiffs had received indications that its earlier accounting was inaccurate). Therefore, accepting the Complaint's factual allegations as true, Plaintiffs have pled conduct that constitutes strong circumstantial evidence of conscious misbehavior or recklessness, and thus have met the scienter requirements to state a claim against Morgan Stanley with respect to the Company's disclosures in the third and fourth quarters of 2007.

Plaintiffs also adequately state scienter allegations against Defendants, Mack, Sidwell, Cruz and Daula. While officers cannot be imputed with knowledge about all transactions which occur at a corporation, they do have a duty to familiarize themselves with the core operations of the Company. *In re Winstar Communications*, 01 Civ. 3014(GBD), 2006 WL 473885 at *7 (S.D.N.Y. Feb. 27, 2006) (High level corporate officers who signed SEC filings containing the company's financial statement have a duty to familiarize themselves with the facts relevant to the core operations of the company and the financial reporting of those operations). *See also In re Rhodia S.A. Sec. Litig.*, 531 F.Supp.2d 527, 550 (S.D.N.Y.2007); *In re Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 05 CIV. 1898(SAS), 2005 WL 2148919 at *12 (S.D.N.Y. Sept. 6, 2005); *In re Alstom SA Sec. Lit.*, 406 F.Supp.2d 433, 459 (S.D.N.Y. 2005). Given the magnitude of the subprime mark-downs in the third quarter earnings statement (a $1.9 billion quarterly loss against $8 billion in net quarterly revenue), the allegations that the Company understated the mark-downs by $2.5 billion, the central roles that Mack and Sidwell played at the Company (CEO and CFO), and the fact that the two signed the Company's Third Quarter Form 10–Q (and therefore had a duty to familiarize themselves with the nature of the mark-downs), scienter can be imputed to Mack and Sidwell.

Similarly, given the allegations that Defendant Cruz was head of the division responsible for the swap positions, was aware of concerns involving the swap position, and had participated in the issuance of the Third Quarter Form 10–Q, the Complaint sufficiently pleads scienter against her. *See In re Atlas Air Worldwide Hldgs.*, 324 F.Supp.2d at 497 (holding that it is reasonable to impute knowledge to a signatory of SEC filings directly involved

---

**10.** Notably, Plaintiffs allege that Defendants were able to meet these expectations by using subjective Level 3 inputs to value the Company's subprime position, and that it shifted to a Level valuation methodology in the months before it had to announce results. (Compl. ¶ 192.)

in the day-to-day operations of the company). Plaintiffs also adequately plead scienter against Defendant Daula by alleging that he raised "very vocal" concerns about the subprime models used by the Company.

Plaintiffs' scienter allegations for Kelleher present a closer question, since he did not become CFO until October 11, 2007 and Plaintiffs do not establish that he was familiar with the Company's subprime losses before that date. Nevertheless, Kelleher was the CFO on November 7, 2007 and allegedly misstated the Company's subprime losses and misstated the accuracy of the Company's third quarter mark-downs in a public conference call with analysts and investors that day. As with Sidwell and Mack, Kelleher had a duty to familiarize himself with the basis of his statements, and scienter can therefore be imputed to him for the misstatements that took place in the fourth quarter of 2007.

e. Loss Causation

■ Despite their lengthy pleadings detailing Defendants' alleged misstatements and scienter, Plaintiffs fail to present sufficient allegations of loss causation. To allege loss causation, a plaintiff only needs to meet the standards of Rule 8 notice pleading, and "provide [the] defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347, 125 S.Ct. 1627, 161 L.Ed.2d 577(2005); *Hunt v. Enzo Biochem, Inc.*, 471 F.Supp.2d 390, 409 n. 120 (S.D.N.Y.2006) (collecting post-Dura cases applying Rule 8 to allegations of loss causation). Therefore, at the motion to dismiss stage, a "Securities Complaint need not rule out all competing theories for the drop in [a defendant's] stock price; that is

an issue to be determined by the trier of fact on a fully developed record." *In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 763 F.Supp.2d at 507, 2011 WL 223540 at *68.

■ However, as Defendants correctly point out, to establish loss causation, the Plaintiffs must allege that "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir.2005). *See also Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, 645 F.Supp.2d 210, 228 (S.D.N.Y.2009) (restatements of income by defendants did not reveal the fraud underlying the complaint); *In re Take–Two Interactive Sec. Litig.*, 551 F.Supp.2d 247, 283 (S.D.N.Y.2008) (the "disclosure must possess a sufficient nexus to a prior misstatement such that it reveals at least part of the falsity of that misstatement"). Here Plaintiffs allege vaguely that "first rumors, then speculation, and finally, on November 7, 2007, confirmation by the Company of large losses relating to undisclosed exposures to U.S. subprime markets caused Morgan Stanley's stock price to fall from $67.26, the closing price on October 31, 2007 to $51.19, the closing price on November 7." (Compl. ¶ 442) Plaintiffs make similarly vague allegations throughout the Complaint, alleging in another instance that "In response to the initial rumors and then the press release regarding Morgan Stanley's subprime exposures and resulting losses, the Company's stock dropped approximately 8%." (Compl. ¶ 287) Absent from these allegations are any facts linking the alleged misstatements the Company had made about the value of its swap positions in the third quarter of 2007 to the events that caused the stock slide during the first week in November.[11] Thus

11. Plaintiffs also do not adequately allege what losses, if any, are attributable to the

Company's November 7, 2007 misstatement.

when Plaintiffs allege that "rumors began circulating [about] a massive subprime trade gone awry", they do not allege whether the rumors, related to the inaccurate write-down at the heart of the Complaint. Accordingly, Plaintiffs have failed to meet the liberal standards of notice pleading, and have failed to plead loss causation and fail to state any claim under Section 10(b).

## C. Section 20(a) Claims (Count Two)

 To state a claim for control person liability under Section 20(a), Plaintiffs must allege (a) a primary violation by a controlled person, (b) actual control by the defendant, and (c) the controlling person's culpable participation in the primary violation. *See In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F.Supp.2d 148, 170–71 (S.D.N.Y.2008). Because Plaintiffs have failed to plead sufficiently a primary violation, as set forth above, they also fail to state a claim under Section 20(a) of the Exchange Act.[12]

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss the Amended Class Action Complaint pursuant to Rule 9(b) and Rule 12(b)(6) of the Federal Rules of Civil Procedure and section 78u–4(b) of the Private Securities Litigation Reform Act is GRANTED. Plaintiffs may file a second amended complaint that presents adequate allegations of loss causation with respect to the Company's misstatements of its subprime valuations in the third and/or fourth quarters of 2007. Plaintiffs may also attempt to amend their claims regarding the Company's misstatements of its subprime

exposure. All other claims are dismissed with prejudice.

Any amended complaint shall be filed within 45 days of the date of this Order. Failure to do so shall result in dismissal of this case in its entirety.

SO ORDERED.

---

12. The Complaint does not plead a Section 10(b) claim against Defendant Lynch, but still pleads a Section 20(a) claim against him. The Court does not find any alleged facts in the Complaint that would constitute a predicate violation sufficient to state a 20(a) claim against Lynch, and accordingly dismisses the Section 20(a) claim against him as well.