*13-0627-cv*
*Fjarde AP-Fonden v. Morgan Stanley*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term 2013

Argued: December 10, 2013
Decided: January 12, 2015

No. 13-0627-cv

_____

JOEL STRATTE-MCCLURE ,
*Plaintiff,*

FJARDE AP-FONDEN ,
*Plaintiff-Appellant,*

PLAINTIFF STATEBOSTON RETIREMENT SYSTEM,
STATE-BOSTON RETIREMENT SYSTEM,
*Movant-Appellant,*

-v-

MORGAN STANLEY, a Delaware Corporation, JOHN J. MACK,
ZOE CRUZ, DAVID SIDWELL, THOMAS COLM KELLEHER, THOMAS V. DAULA,
*Defendants-Appellees,*

GARY G. LYNCH,
*Defendant.*

_____

1

Before: CABRANES, WESLEY, and LIVINGSTON

Appeal from April 4, 2011 and January 18, 2013 orders of the United States District Court for the Southern District of New York (Batts, *J.*), granting the Defendants' motions to dismiss. For the reasons stated here and in a summary order issued simultaneously with this opinion, we **AFFIRM** the order granting the Defendants' motion to dismiss.

AFFIRMED.

David Kessler (Andrew L. Zivitz, Kimberly A. Justice, Richard A. Russo, Jr., Joshua A. Materese, *on the brief*) Kessler Topaz Meltzer & Check, LLP, Radnor, PA, *for Plaintiff-Appellant Fjarde AP-Fonden and for the Class.*

JAVIER BLEICHMAR (Jonathan M. Plasse, Joseph A. Fonti, Wilson M. Meeks, *on the brief*), Labaton Sucharow LLP, New York, NY, *for Movant-Appellant State-Boston Retirement System and for the Class.*

ROBERT F. WISE, JR. (Charles S. Duggan, Andrew Ditchfield, *on the brief*), Davis Polk & Wardwell LLP, New York, NY, *for Defendants-Appellees.*

DEBRA ANN LIVINGSTON, *Circuit Judge*:

Lead Plaintiffs State-Boston Retirement System and Fjarde AP-Fonden brought this putative securities fraud class action on behalf of themselves and other similarly situated investors ("Plaintiffs") pursuant to Sections 10(b) and 20(a), 15

U.S.C. §§ 78j(b) and 78t(a), of the Securities Exchange Act of 1934. They allege that Morgan Stanley and six of its officers and former officers — John J. Mack, Zoe Cruz, David Sidwell, Thomas Colm Kelleher, and Thomas Daula (collectively, "Morgan Stanley" or "Defendants") — made material misstatements and omissions between June 20, 2007 and November 19, 2007 (the "class period") in an effort to conceal Morgan Stanley's exposure to and losses from the subprime mortgage market. As a result, Plaintiffs claim, they suffered substantial financial loss when Morgan Stanley's stock prices dropped following public disclosure of the truth about Morgan Stanley's positions and losses.

The United States District Court for the Southern District of New York (Batts, *J.*) dismissed all claims on the pleadings for failure to state a claim, and we affirm. For the reasons stated in this opinion, we conclude that the district court properly dismissed Plaintiffs' claim that Defendants' omission of information purportedly required to be disclosed under Item 303 of Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii) ("Item 303"), violated Section 10(b). We also affirm its order dismissing Plaintiffs' other claims in a summary order issued simultaneously with this decision.

# **BACKGROUND**[1]

This case arises out of a massive proprietary trade executed by Morgan Stanley's Proprietary Trading Group in December 2006. The trade consisted of two components: a $2 billion short position ("Short Position") and a $13.5 billion long position ("Long Position"). In the Short Position, Morgan Stanley purchased credit default swaps ("CDSs") on collateralized debt obligations ("CDOs") backed by "mezzanine tranches" of subprime residential mortgage-backed securities ("RMBSs").[2] These CDSs operated like insurance policies — Morgan Stanley paid annual premiums for the assurance that, if the housing market worsened and the mezzanine RMBS tranches backing its CDOs defaulted or declined in value, it would

_____

[1] The facts presented here are drawn from the allegations in Plaintiffs' second amended complaint, which we accept as true for the purposes of reviewing the motion to dismiss. *See Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 107 (2d Cir. 2012). Although we decide only one issue in this opinion, we describe the Plaintiffs' allegations in greater detail to provide context.

[2] Briefly, as described by Plaintiffs, a RMBS is created by pooling thousands of residential mortgages into a trust. The trust then issues bonds, which investors purchase. The mortgages serve as collateral for these bonds, and the interest on the bonds derives from the cash flow created by mortgage payments. RMBSs can be aggregated into CDOs, which are sold in "tranches" based on priority of entitlement to the cash flow. Each tranche of a given RMBS is exposed to the same pool of mortgages, but lower tranches sustain losses before higher tranches in the event that mortgages in the pool default or do not meet payment deadlines. CDOs are similarly divided into higher and lower tranches.

receive payments. In the Long Position, Morgan Stanley *sold* CDSs. These CDSs, like those it bought for the Short Position, referenced CDOs backed by mezzanine tranches of subprime RMBSs. But the CDOs referenced by the Long Position were super-senior tranches of CDOs that were higher-rated and lower-risk than the CDOs referenced by the Short Position. Through the Long Position, Morgan Stanley therefore received premium payments for the guarantee that it would pay the CDS purchasers in the event that these lower-risk CDO tranches defaulted or declined in value. Morgan Stanley could use the income from those premiums to finance the Short Position, but would have to make payouts if the CDO tranches referenced by the Long Position suffered defaults — up to a maximum of $13.5 billion in the event of a 100 percent default in these CDOs. In essence, the company was betting that defaults in the subprime mortgage markets would be significant enough to impair the value of the higher-risk CDO tranches referenced by the Short Position, but not significant enough to impair the value of the lower-risk CDO tranches referenced by the Long Position.

According to the Plaintiffs, "[b]y mid-2006, the biggest housing bubble in U.S. history had popped." J.A. 465. Subprime mortgages issued in 2005 and 2006, like those backing Morgan Stanley's proprietary trade, rapidly began to suffer from

5

delinquencies and defaults. "On February 12, 2007, Morgan [Stanley] economist Richard Berner acknowledged that these '[s]oaring defaults signal that the long-awaited meltdown in subprime mortgage lending is now underway[.]'" J.A. 469. Although Morgan Stanley's Proprietary Trading Group had correctly predicted the direction that the subprime housing market would turn, it apparently underestimated the magnitude of the collapse. The value of Morgan Stanley's swap positions declined substantially over the course of 2007, and Morgan Stanley ultimately lost billions of dollars on the proprietary trade.

Plaintiffs allege that Defendants made numerous material misstatements and omissions from June 20, 2007 through November 19, 2007 to conceal Morgan Stanley's exposure to and losses from this subprime proprietary trade. The second amended complaint identifies two categories of misrepresentations and omissions: (1) misrepresentations and omissions regarding Morgan Stanley's exposure to credit risk related to the U.S. subprime mortgage market arising from its Long Position (the "exposure claim"), and (2) misrepresentations regarding Morgan Stanley's losses arising from the Long Position (the "valuation claim"). Plaintiffs allege that these misstatements and omissions fraudulently inflated Morgan Stanley's stock price

during the class period and caused them to suffer financially when the market learned the truth about Morgan Stanley's exposure and losses.

**A. Exposure Claim**

The second amended complaint alleges that Defendants materially misrepresented Morgan Stanley's exposure to the subprime mortgage market. Plaintiffs rely on four statements from Morgan Stanley officers, and one alleged omission. First, on a June 20, 2007 call with market analysts about Morgan Stanley's second quarter earnings, Defendant Sidwell stated that "concerns early in the quarter about whether issues in the sub-prime market were going to spread dissipated." J.A. 498. Second, on that same call, Sidwell responded to a request to characterize Morgan Stanley's position in the mortgage market and to explain the decline in the company's fixed income revenues by stating that Morgan Stanley "really did benefit" from conditions in the subprime market in the first quarter of 2007, and "certainly did not lose money in this business" during the second quarter. J.A. 498, 499. Third, during another earnings call with market analysts on September 19, 2007, Defendant Kelleher stated that Morgan Stanley "remain[ed] exposed to risk exposures through a number of instruments [including] CDOs," without describing the extent of that exposure. J.A. 506-07. And fourth, Kelleher stated in an October

7

24, 2007 interview with CIBC World Markets analyst Meredith Whitney that he "[did] not see further write-downs to [Morgan Stanley's] carrying values over the near term." J.A. 516. Plaintiffs claim that each of these statements was materially false or misleading.

As pertinent here, Plaintiffs also allege that Defendants made material omissions in their 10-Q filings by failing to disclose the existence of the Long Position, that Morgan Stanley had sustained losses on that position in the second and third quarters of 2007, and that the company was likely to incur additional significant losses on the position in the future. They argue that Item 303 of Regulation S-K and related guidance requires companies to disclose on their 10-Q filings any "known trends, or uncertainties that have had, or might reasonably be expected to have, a[n] . . . unfavorable material effect" on the company's "revenue, operating income or net income." J.A. 465. Plaintiffs claim that "[b]y July 4[, 2007,] at the latest, Defendants knew that the Long Position was reasonably expected to have an unfavorable material effect on revenue." J.A. 482. It is not disputed that Morgan Stanley did not make this Item 303 disclosure on its 10-Q filings in 2007.

**B. Valuation Claim**

In a separate claim, the second amended complaint alleges that Morgan Stanley overstated its earnings in the third quarter of 2007 because it did not sufficiently write down the value of its Long Position. According to Plaintiffs, the Long Position's value was "inherently linked" to an index of RMBSs known as the ABX.BBB.06-1 Index (the "ABX Index"). Thus, when the ABX Index declined by 32.8 percent in the third quarter of 2007, Morgan Stanley should have marked down the value of the Long Position by that same percentage and disclosed the loss in its quarterly statement. Instead of taking that $4.4 billion markdown, however, Morgan Stanley recognized only a $1.9 billion loss on the Long Position after valuing it using internal models that did not exclusively rely on the ABX Index. Plaintiffs allege that Morgan Stanley later wrote down the value of the Long Position by a percentage *greater* than that dictated by the ABX Index in order to make up for the misstatement in the third quarter.

**C. Procedural History**

Plaintiffs brought suit in the United States District Court for the Central District of California, filing an initial complaint in early 2008 and then an amended complaint on November 24, 2008. The case was then transferred to the United States

9

District Court for the Southern District of New York (Batts, *J.*), where Defendants moved to dismiss all claims pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and Section 78u-4(b) of the Private Securities Litigation Reform Act. *Stratte-McClure v. Morgan Stanley*, 784 F. Supp. 2d 373, 376 (S.D.N.Y. 2011). The district court granted the motion to dismiss on April 4, 2011. *Id.* at 391. On the exposure claim, the district court ruled that the amended complaint did not specify why Defendants' statements about risk and its trading positions were false or misleading and decided that Defendants had no obligation to disclose the Long Position. *See id.* at 385-86. On the valuation claim, the district court ruled that Plaintiffs failed to plead loss causation. *See id.* at 390-91. The court granted Plaintiffs leave to amend their pleadings with regard to the exposure claim and loss causation on the valuation claim, but otherwise dismissed Plaintiffs' claims with prejudice. *See id.* at 391.

On June 9, 2011, Plaintiffs filed a second amended complaint and Defendants moved to dismiss soon thereafter. Once again, the district court dismissed all of the claims. *Stratte-McClure v. Morgan Stanley*, No. 09-Civ.-2017, 2013 WL 297954 (S.D.N.Y. Jan. 18, 2013). The district court found no reason to alter its earlier decision that Plaintiffs failed to plead loss causation for the valuation claim. *See id.*

at *12-*13. With regard to the affirmative statements considered in connection with the exposure claim, the district court found no reason to alter its earlier decision that Plaintiffs did not sufficiently plead falsity. *See id.* at *4-*5. But this time, the court ruled that Morgan Stanley *did* have a duty under Item 303 to disclose the Long Position in its 2007 Form 10-Q filings. *See id.* at *7. The district court justified the change in its stance by relying on this Court's intervening decisions in *Panther Partners Inc. v. Ikanos Communications, Inc.*, 681 F.3d 114 (2d Cir. 2012), and *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706 (2d Cir. 2011), which held that Item 303 may provide a basis for disclosure obligations under Sections 11 and 12(a)(2) of the Securities Act of 1933. 2013 WL 297954, at *5. The district court nevertheless dismissed the exposure claim after deciding that the second amended complaint failed to plead "a strong inference of scienter" with respect to Defendants' failure to disclose the Long Position. *Id.* at *9. Plaintiffs now appeal both district court decisions.

## DISCUSSION

We review *de novo* the district court's judgment granting Defendants' motion to dismiss. *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 65 (2d Cir. 2012). "To survive a motion to dismiss, a complaint must contain sufficient factual

11

matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). In making this determination, we consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (citations omitted).

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of [the] rules and regulations" that the SEC prescribes. 15 U.S.C. § 78j. In turn, Rule 10b-5, which implements Section 10(b), provides:

It shall be unlawful for any person, directly or indirectly . . . :

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

12

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. To state a claim for securities fraud under these provisions a plaintiff must allege that each defendant "(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007).

This opinion addresses the district court's decision that Morgan Stanley's failure to disclose the Long Position in its July and October 10-Q filings, in alleged disregard of Item 303 of Regulation S-K, constituted an actionable omission under Section 10(b) and Rule 10b-5.[3] We conclude, as a matter of first impression in this Court, that a failure to make a required Item 303 disclosure in a 10-Q filing is indeed an omission that can serve as the basis for a Section 10(b) securities fraud claim. However, such an omission is actionable only if it satisfies the materiality requirements outlined in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and if all of the

[3] As already noted, Plaintiffs' remaining claims are addressed in the summary order filed simultaneously with this opinion.

other requirements to sustain an action under Section 10(b) are fulfilled. Here, the district court properly dismissed Plaintiffs' exposure claim predicated on Morgan Stanley's failure to disclose under Item 303 because the second amended complaint did not sufficiently plead scienter.

## I.

The Supreme Court has instructed that "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic*, 485 U.S. at 239 n.17; *see also Chiarella v. United States*, 445 U.S. 222, 230 (1980). As a result, we have consistently held that "an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993); *see Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992). Such a duty may arise when there is "a corporate insider trad[ing] on confidential information," a "statute or regulation requiring disclosure," or a corporate statement that would otherwise be "inaccurate, incomplete, or misleading." *Glazer*, 964 F.2d at 157 (quoting *Backman v. Polaroid Corp.*, 910 F.2d 10, 12 (1st Cir. 1990) (en banc)); *accord Oran v. Stafford*, 226 F.3d 275, 285-86 (3d Cir. 2000).

As Plaintiffs correctly argue, Item 303 of Regulation S-K imposes disclosure requirements on companies filing SEC-mandated reports, including quarterly Form

14

10-Q reports.  *See* Louis Loss & Joel Seligman, *Fundamentals of Securities Regulation* 512 & n.14 (5th ed. 2004).  Those requirements include the obligation to "[d]escribe any known trends or uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii).  The SEC has provided guidance on Item 303, clarifying that disclosure is necessary "where a trend, demand, commitment, event or uncertainty is both presently known to management and  reasonably likely to have material effects on the registrant's financial conditions or results of operations."  Management's Discussion and Analysis of Financial Condition and Results of Operations, Exchange Act Release No. 6835, 43 S.E.C. Docket 1330, 1989 WL 1092885, at *4 (May 18, 1989) [hereinafter Exchange Act Release No. 6835].

Item 303's affirmative duty to disclose in Form 10-Qs can serve as the basis for a securities fraud claim under Section 10(b).  We have already held that failing to comply with Item 303 by omitting known trends or uncertainties from a registration statement or prospectus is actionable under Sections 11 and 12(a)(2) of the Securities Act of 1933.[4]  *See Panther Partners*, 681 F.3d at 120; *Litwin*, 634 F.3d at 716; *accord J&R*

---

[4] We have also held that defendants' failure to make required disclosures under Item 303 contributed to an adequately pled securities fraud claim under Section 10(b) in *In re Scholastic Corp. Securities Litigation*, 252 F.3d 63, 70-74 (2d Cir. 2001).  While that

15

*Mktg. v. Gen. Motors Corp.*, 549 F.3d 384, 392 (6th Cir. 2008); *Silverstrand Invs. v. AMAG Pharm., Inc.*, 707 F.3d 95, 102-03, 107 (1st Cir. 2013). Like Section 12(a)(2), Rule 10b-5 requires disclosure of "material fact[s] necessary in order to make . . . statements made . . . not misleading." This Court and our sister circuits have long recognized that a duty to disclose under Section 10(b) can derive from statutes or regulations that obligate a party to speak. *See, e.g.*, *Glazer*, 964 F.2d at 149; *Backman*, 910 F.2d at 20; *Oran*, 226 F.3d at 285-86; *Gallagher v. Abbott Labs.*, 269 F.3d 806, 808 (7th Cir. 2001). And this conclusion stands to reason — for omitting an item

---

case also involved affirmatively misleading statements, we cited defendants' alleged failure to disclose trends in its Form 10-Q, despite a duty under Item 303 to disclose those trends, as evidence that plaintiffs adequately alleged a Section 10(b) violation, implying that Item 303's affirmative duty to disclose in Form 10-Qs can serve as the basis for a securities fraud claim under Section 10(b). *See id.* Nevertheless, perhaps because *In re Scholastic* did not squarely address whether Item 303 can give rise to a duty to disclose under 10b-5, district courts in this Circuit have continued to express confusion on the issue. *See, e.g.*, *Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 206 n.25 (D. Conn. 2014) ("[I]t is far from certain that the requirement that there be a duty to disclose under Rule 10b-5 may be satisfied by importing the disclosure duties from S-K 303. . . ." (internal quotation marks omitted)); *In re Nevsun Res. Ltd.*, No. 12-cv-1845, 2013 WL 6017402, at *11 n.4 (S.D.N.Y. Sept. 27, 2013) ("Plaintiffs cannot base their Section 10(b) claim on a theory that Defendants violated Item 303."); *cf. In re Corning, Inc. Sec. Litig.*, 349 F. Supp. 2d 698, 716 (S.D.N.Y. 2004) ("[T]he Second Circuit . . . reversed a district court's dismissal of a Rule 10b-5 claim that was based on a defendant's failure to make disclosures allegedly required under SK-303. It would appear that the [District] Court must consider Item 303 in connection with plaintiffs' claim under Rule 10b-5." (citing *In re Scholastic*, 252 F.3d at 74)).

16

required to be disclosed on a 10-Q can render that financial statement misleading. Like registration statements and prospectuses, Form 10-Qs are mandatory filings that "speak . . . to the entire market." *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1222 (1st Cir. 1996) (abrogated by statute on other grounds). As required elements of those filings, Item 303 disclosures "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations." Exchange Act Release No. 6835, 1989 WL 1092885, at *17. Due to the obligatory nature of these regulations, a reasonable investor would interpret the absence of an Item 303 disclosure to imply the nonexistence of "known trends or uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii); *see also* Donald C. Langevoort & G. Mitu Gulati, *The Muddled Duty to Disclose Under Rule 10b-5*, 57 Vand. L. Rev. 1639, 1680 (2004). It follows that Item 303 imposes the type of duty to speak that can, in appropriate cases, give rise to liability under Section 10(b).[5]

---

[5] Because Section 10(b) prohibits "manipulative or deceptive device[s] . . . in contravention of [the SEC's] rules and regulations," 15 U.S.C. § 78j, allowing a 10b-5 cause of action to arise from a failure to disclose under Item 303 does not exceed what

The failure to make a required disclosure under Item 303, however, is not by itself sufficient to state a claim for securities fraud under Section 10(b). Significantly, Rule 10b-5 makes only "material" omissions actionable. 17 C.F.R. § 240.10b-5(b). In *Basic Inc. v. Levinson*, the Supreme Court concluded that, in securities fraud cases under Section 10(b) and Rule 10b-5, the materiality of an allegedly required forward-looking disclosure is determined by "a *balancing* of both the *indicated probability* that the event will occur and the *anticipated magnitude* of the event in light of the totality of the company activity." 485 U.S. at 238 (quoting *SEC v. Texas Gulf Sulfur Co.*, 401 F.2d 833, 849 (2d Cir. 1968) (en banc)) (emphasis added). The SEC's test for a duty

Congress "authorize[d] when it first enacted the [Securities Exchange Act]." *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011) (internal quotation marks omitted); *see also Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 173 (1994) ("[A] private plaintiff may not bring a 10b-5 suit against a defendant for acts not prohibited by the text of § 10(b)."). Our conclusion that Item 303 may provide the basis for a 10b-5 violation is supported by an SEC Cease and Desist Order, in which the Commission held that a company violated Section 10(b) and Rule 10b-5 by failing to include in Form 10-Qs information it was obligated to disclose under Item 303. *In re Valley Sys., Inc.*, File No. 3-8811, 1995 WL 547801, at *4 (S.E.C. Sept. 14, 1995). Our decision is also consistent with an opinion in the First Circuit. *See Shaw*, 82 F.3d at 1222 & n.37 ("[I]n the context of a public offering, plaintiffs who (through the market) rely upon the completeness of a registration statement or prospectus may sue under Section 10(b) and Rule 10b–5 for nondisclosures of material facts omitted from those documents in violation of the applicable SEC rules and regulations.").

18

to report under Item 303, on the other hand, involves a two-part (and different) inquiry. Once a trend becomes known, management must make two assessments:

> (1) Is the known trend . . . likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend . . . on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

Exchange Act Release No. 6835, 1989 WL 1092885, at *6. According to the SEC, this disclosure standard is unique to Item 303, and "[t]he probability/magnitude test for materiality approved by the Supreme Court in [*Basic*] is inapposite." *Id.* at *6 n.27; *see also Oran*, 226 F.3d at 288 (noting that Item 303's disclosure obligations "extend considerably beyond those required by Rule 10b-5").

Since the Supreme Court's interpretation of "material" in Rule 10b-5 dictates whether a private plaintiff has properly stated a claim, we conclude that a violation of Item 303's disclosure requirements can only sustain a claim under Section 10(b) and Rule 10b-5 if the allegedly omitted information satisfies *Basic*'s test for materiality. That is, a plaintiff must first allege that the defendant failed to comply

19

with Item 303 in a 10-Q or other filing. Such a showing establishes that the defendant had a duty to disclose. A plaintiff must then allege that the omitted information was material under *Basic*'s probability/magnitude test, because 10b-5 only makes unlawful an omission of "material information" that is "necessary to make . . . statements made," in this case the Form 10-Qs, "not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1321-22 (2011) (quoting 17 C.F.R. § 240.10b-5(b)) (internal quotation marks omitted). Of course, as with any Section 10(b) claim, a plaintiff must also sufficiently plead scienter, a "connection between the . . . omission and the purchase or sale of a security," reliance on the omission, and an economic loss caused by that reliance. *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013).

We note that our conclusion is at odds with the Ninth Circuit's recent opinion in *In re NVIDIA Corp. Securities Litigation*, 768 F.3d 1046 (9th Cir. 2014). That case held that Item 303's disclosure duty is not actionable under Section 10(b) and Rule 10b-5, relying on a Third Circuit opinion by then-Judge Alito, *Oran v. Stafford*, 226 F.3d at 275. But *Oran* simply determined that, "[b]ecause the materiality standards for Rule 10b-5 and [Item 303] differ significantly," a violation of Item 303 "does not *automatically* give rise to a *material* omission under Rule 10b-5." *Id.* at 288 (emphasis

20

added). Having already decided that the omissions in that case were not material under *Basic*, the Third Circuit concluded that Item 303 could not "provide a basis for liability." *Id.* Contrary to the Ninth Circuit's implication that *Oran compels* a conclusion that Item 303 violations are never actionable under 10b-5, *Oran* actually suggested, without deciding, that in certain instances a violation of Item 303 *could* give rise to a material 10b-5 omission. At a minimum, *Oran* is consistent with our decision that failure to comply with Item 303 in a Form 10-Q can give rise to liability under Rule 10b-5 so long as the omission is material under *Basic*, and the other elements of Rule 10b-5 have been established.

The Ninth Circuit's opinion in *NVIDIA* also misconstrues the relationship between Rule 10b-5 and Section 12(a)(2) of the Securities Act. In *Litwin* and *Panther Partners*, we established that Item 303 creates a duty to disclose for the purposes of liability under Section 12(a)(2). *Litwin*, 634 F.3d at 716; *Panther Partners*, 681 F.3d at 120. The Ninth Circuit had also adopted that position. *See Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998). In *NVIDIA*, a panel of the Ninth Circuit found these decisions irrelevant to its interpretation of Rule 10b-5. But Section 12(a)(2)'s prohibition on omissions is textually identical to that of Rule 10b-5: both make unlawful omission of "material fact[s] . . . necessary in order to make . . .

21

statements, in light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77*l*; *see also* 17 C.F.R. § 240.10b-5. SEC regulations, like Item 303, dictate the contents of mandatory disclosures — be they Form 10-Qs in the case of Rule 10b-5 or prospectuses in the case of Section 12(a)(2) — and are therefore an essential part of the circumstances under which such disclosures are made. *Litwin* and *Panther Partners* recognized that issuing financial statements that omit elements required by Item 303 can mislead investors. Those decisions provide firm footing for our decision in this case.

## II.

Applying the standards set forth above, we conclude that Plaintiffs have adequately alleged that Defendants breached their Item 303 duty to disclose that Morgan Stanley faced a deteriorating subprime mortgage market that, in light of the company's exposure to the market, was likely to cause trading losses that would materially affect the company's financial condition. We assume, *arguendo*, that this omission was material under *Basic*. We nonetheless affirm the district court's dismissal of the claim, concluding that Plaintiffs failed adequately to plead scienter. Plaintiffs have plausibly alleged that, by the second and third quarters of 2007, there was a significant downward trend in the subprime residential mortgage market that

22

could negatively affect Morgan Stanley's overall financial position. To begin with, Plaintiffs allege that market watchers, including Morgan Stanley analysts, reported a downward trend in the real estate and subprime mortgage markets as early as 2006. By February 27, 2007, a Morgan Stanley economist had written that "[s]oaring defaults signal that the long-awaited meltdown in subprime mortgage lending is now underway," and the company's own CDO analysts reported significant risks to CDOs backed by asset backed securities, including RMBSs. J.A. 469. That trend continued into the summer, when Morgan Stanley analysts allegedly reported that "[r]atings downgrades in [asset backed] CDO tranches are inevitable and material," that those CDOs were expected to "remain under severe pressure," and that long-term value assessment metrics would continue to decline. J.A. 473 (emphasis omitted).

Plaintiffs have also plausibly alleged that Morgan Stanley had significant exposure to a sharp downturn in the subprime market through its Long Position. At the beginning of the class period, Defendants had already written down the Long Position by $300 million as a result of the weakening market. While that write-down did not exceed gains from the Short Position, it did catch the Defendants' attention, and Morgan Stanley ordered stress tests on the Long Position and then initiated a

23

task force to find strategies to sell off its assets that were placed at risk by the collapse of the subprime market. At the motion to dismiss stage, these allegations are sufficient to support a claim that Morgan Stanley was faced with a "known trend[] . . . that [was] reasonably expected to have material effects" on the company's financial position. Exchange Act Release No. 6835, 1989 WL 1092885 at *4 (emphasis omitted) (describing "reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract" as examples of "currently known trends").

Defendants argue that they satisfied their obligations under Item 303 by disclosing the deterioration of the real estate, credit, and subprime mortgage markets, and its potential negatively to affect Morgan Stanley. But Morgan Stanley's disclosures about market trends were generic, spread out over several different filings, and often unconnected to the company's financial position. Such "generic cautionary language" does not satisfy Item 303. *See Panther Partners*, 681 F.3d at 122. The SEC has emphasized that Item 303 "requires not only a 'discussion' but also an 'analysis' of known material trends," and that disclosure is "necessary to an understanding of a company's performance, and the extent to which reported financial information is indicative of future results." Commission Guidance

Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, Release Nos. 33-8350, 34-48960, 68 Fed. Reg. 75056, 75061 (Dec. 29, 2003) [hereinafter Release No. 34-48960]. Plaintiffs have adequately alleged that Morgan Stanley's patchwork commentary on the relevant market trends did not live up to that obligation.

That is not to say, however, that Morgan Stanley's disclosure obligations were as extensive as the district court decided. As we have emphasized, Item 303 requires disclosure of a known trend and the "manner in which" it "might reasonably be expected to materially impact" a company's overall financial position. *Litwin*, 634 F.3d at 718-19.[6] The SEC has cautioned that this obligation requires "quantitative information" only when it is "reasonably available and will provide material information for investors." Release No. 34-48960, 68 Fed. Reg. at 75062, 75065. Contrary to the district court's view, the Commission has never gone so far as to require a company to announce its internal business strategies or to identify the

---

[6] The SEC distinguishes required disclosures about "currently known trends . . . that are reasonably expected to have material effects" and optional "forward-looking disclosure[s]" that "involve[] anticipating a future trend . . . or anticipating a less predictable impact of a known event, trend or uncertainty." Exchange Act Release No. 33-6835, 1989 WL 1092885, at *4. "Any forward-looking information supplied is expressly covered by the safe harbor rule for projections." 17 C.F.R. § 229.303(a), Instruction 7.

particulars of its trading positions such as the Long Position. This is in line with this Court's reluctance to interpret the securities laws in a manner that requires companies to give competitors notice of proprietary strategies and information. *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 809 (2d Cir. 1996). Therefore, instead of being required to disclose the details of the Long Position, under Item 303, Morgan Stanley needed to disclose only that it faced deteriorating real estate, credit, and subprime mortgage markets, that it had significant exposure to those markets, and that if the trends came to fruition, the company faced trading losses that could materially affect its financial condition.[7]

The Plaintiffs, moreover, while adequately alleging that Defendants breached their Item 303 duty to disclose, did not adequately plead a claim under Section 10(b). For Defendants' breach of their Item 303 duty to be actionable under Section 10(b), Plaintiffs were required adequately to plead each element of a 10b-5 securities fraud claim. The second amended complaint does not accomplish that goal. We assume, without deciding, that Morgan Stanley's failure to disclose pursuant to Item 303 met the materiality threshold established by *Basic*. The Plaintiffs' exposure claim

_____

[7] As discussed *supra*, however, Morgan Stanley was required to connect the trends to its financial position and to offer more than "generic cautionary language." *Panther Partners*, 681 F.3d at 122.

nonetheless fails because the second amended complaint does not give rise to a strong inference of scienter.

The Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b), subjects Section 10(b) claims to heightened pleading standards. To adequately plead scienter, the statute requires that plaintiffs allege facts giving rise to a "strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A). This requirement can be satisfied by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*, 493 F.3d at 99. Here, Plaintiffs rely solely on the Defendants' alleged conscious misbehavior or recklessness and therefore must show "conscious recklessness — *i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (quoting *Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000)) (emphasis omitted). We consider the complaint in its entirety and "take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). The inference of scienter "must be . . . cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

27

at 324; *see Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

The district court correctly ruled that the second amended complaint does not include sufficient facts to give rise to a strong inference of scienter as to the matter omitted from the 10-Q filings. To meet that requirement, Plaintiffs must allege that Defendants were at least consciously reckless regarding whether their failure to provide adequate Item 303 disclosures during the second and third quarters of 2007 would mislead investors about material facts. *See ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 202 (2d Cir. 2009) (concluding that, to adequately plead scienter, plaintiffs must plead facts showing that defendants knew an omission was material). Here, Plaintiffs make allegations about developments in the subprime market, internal concern about capital calls and write-downs on the Long Position, and the creation of a task force to investigate selling off some of Morgan Stanley's subprime positions. But these facts do not "approximat[e] actual intent" to mislead investors by failing to make Item 303 disclosures. *South Cherry St.*, 573 F.3d at 109 (emphasis omitted). Specifically, while the complaint makes out that Morgan Stanley was in the process of assessing the risk to its proprietary trade during the second and third quarters of 2007, it is silent

28

about when employees realized that the more pessimistic assessments of the market were likely to come to fruition and that they would be unable to reduce the Long Position. To the contrary, the complaint shows that Cruz ordered Daula and another Morgan Stanley employee, Neal Shear, to cut the Long Position *regardless* of the likelihood that the pessimistic assumptions of the stress test would come to pass. *See* J.A. 477 ("I don't care what your view of probability [sic] is. Cut the position."). The meetings about the proprietary trade show similar caution: Morgan Stanley's task force discussed strategies to reduce the Long Position while also developing a better sense of the "range" of losses the company could face. J.A. 485. Given the rigidity of Form 10-Q filing deadlines, we find no basis to infer anything more than "a heightened form of negligence" (if that) about whether Morgan Stanley's 10-Qs would mislead investors about these internal deliberations, especially after taking into account that Morgan Stanley was also *profiting* from the declining market through its Short Position. *See South Cherry St.*, 573 F.3d at 109; *see also Kalnit v. Eichler*, 264 F.3d 131, 144 (2d Cir. 2001) (holding that where a complaint "does not present facts indicating a clear duty to disclose" it does not establish "*strong* evidence of conscious misbehavior or recklessness").

29

Moreover, as we decide in the summary order issued in tandem with this opinion, Morgan Stanley's affirmative statements about its exposure to the mortgage securities market during the relevant time period were not misleading. *Cf. Matrixx*, 131 S. Ct. at 1324 (finding it "most significant[]" for scienter that the defendant "issued a press release" that affirmatively misrepresented facts). And the company *did* fully report its exposure to mortgage securities backed by subprime loans in November 2007 — less than a month after its third quarter filing and a month in advance of the next quarterly report. *See Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004) (noting that disclosure of facts prior to a filing deadline "weaken[s]" the inference that defendants acted recklessly); *Novak*, 216 F.3d at 308-09 (explaining that scienter should not be found where defendants merely "should have anticipated future events and made certain disclosures earlier than they actually did"). The "most cogent inference" from these allegations, in tandem with assertions about Morgan Stanley's internal deliberations, "is that [the company] delayed releasing information" on its Form 10-Qs in the second and third quarters of 2007 "to carefully review" all of the relevant evidence and was *at worst* negligent as to the effect of the delay on investors. *Matrixx*, 131 S. Ct. at 1324 n.15 (internal quotation marks omitted). Because "a reasonable person" would not deem the inference that Morgan

30

Stanley was consciously reckless about whether its mandated filings would mislead investors "at least as compelling" as this opposing inference, we conclude that the Plaintiffs have not adequately pled scienter. *Tellabs*, 551 U.S. at 324.

## CONCLUSION

To summarize:

(1) We conclude that, as a matter of first impression in this Court, a failure to make a required disclosure under Item 303 of Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii), in a 10-Q filing is an omission that can serve as the basis for a Section 10(b) securities fraud claim, if the omission satisfies the materiality requirements outlined in *Basic v. Levinson*, 485 U.S. at 224, and if all of the other requirements to sustain an action under Section 10(b) are fulfilled.

(2) Plaintiffs have adequately alleged that Defendants breached their Item 303 duty to disclose that Morgan Stanley faced a deteriorating subprime mortgage market that, in light of the company's exposure to the market, was likely to cause trading losses that would materially affect the company's financial condition.

(3) We assume without deciding that this omission met the materiality threshold established by *Basic*. However, we do not agree with the district court regarding the extent of Morgan Stanley's disclosure obligations. Specifically, the Commission has never gone so far as to require a company to announce its internal business strategies or to identify the particulars of its trading positions.

(4) The district court properly dismissed Plaintiffs' claim that Defendants' omissions violated Section 10(b) and Rule 10b-5, because the second amended complaint does not give rise to a strong inference of scienter.

For the foregoing reasons, and for the reasons stated in the summary order issued simultaneously with this opinion, the judgment of the district court is hereby **AFFIRMED**.